First case for argument is Dewitt v. United States. Mr. Patton. Good morning, Your Honors, and may it please the Court, Counsel. My name is Tom Patton, and I represent the petitioner, Samuel Dewitt. Mr. Dewitt supported his ineffective assistance of counsel claim with specific detailed facts which, if proven, would have established that he received ineffective assistance of counsel when his counsel failed to file a motion to suppress his statements to law enforcement and when his counsel failed to investigate other people that may have been potentially responsible for downloading child pornography from the IP address at the House. And because he supported his petition with detailed, specific facts that, if proven, would entitle him to relief, the District Court erred by dismissing the motion without holding a hearing. And I'll focus on the claim of ineffectiveness based on not filing a motion to suppress first. Mr. Dewitt alleged in his sworn affidavit that when the officers showed up with the warrant, there were five officers who were armed. Once they showed him the warrant, he asked to speak with a lawyer, but the lead detective told him that that wasn't necessary. They were just going to ask some routine questions. The police exerted complete control over the situation. The lead detective required and ordered Mr. Dewitt to come out of the apartment down to Mr. Dewitt's vehicle to open the vehicle because the search warrant also covered a search of the vehicle. Well, they had to keep an eye on him while they were searching the apartment, right? So what should they have done? Your Honor, it's certainly clear that they are entitled to that control. Yeah, I know. What should they have done? They should have said that, asked him, do you want to come out and open your car so we can get in there? If he does, fine. They can tell him if you want to come back up, sit down on the couch, sit down somewhere where we can see you. But once they tell him, come direct him into his bedroom, shut the door and start interrogating him about the specifics of the investigation. And then when Mr. Dewitt says, again, I want to talk to a lawyer and the detective tells him, you don't need a lawyer. I've been doing this long enough to know you're the guy we're looking for and you should just make it easier for us and confess. And then badgers him into giving a statement. And that's the allegation in Mr. Dewitt's affidavit. Badgered him how? By continuing to ask him very pointed questions after Mr. Dewitt has said, I want a lawyer. And that's not been honored when he's in the bedroom with the door closed. And I think that that's important because the reason you don't have to give warnings to somebody who's not in custody is they can, so to speak, vote with their feet. They can leave if they're not in custody and avoid the constant and repetitive questioning by leaving. But if you can't leave, or if a reasonable person, an objective person would feel, I can't leave given these circumstances, that no longer becomes an option. Because you're sitting there. You've asked for a lawyer. They've told you we're not going to honor that request. They keep asking you questions designed to incriminate you. Well, could he have left the room? I don't think a reasonable person would have felt that he could leave the room because he has been directed around the apartment when he was asked, could I get my homework from my desk? I'm working on a paper. You guys are disturbing it. The police say no. Now, that's reasonable on behalf of the police. I get that because they want control of the situation. But still, it indicates to a reasonable person, I'm not in charge here. I don't get to decide what happens. The police do. And so while part of this is why you would need to have an evidentiary hearing is the detective can testify and maybe say, look, I never said these things to Mr. DeWitt. Or maybe he says, well, yes, I told him that I thought he was guilty because I've done these investigations for a long time. And that's a common investigative tactic with the police is to tell the person, come on, look, we know you did it. We have overwhelming evidence. You might as well confess it. And that's the kind of pressure when you're in a room where the police are in your house, armed, searching, that Miranda is designed to counter. Well, right, but the nature of the questions doesn't, I mean, that doesn't have anything to do with whether he was in custody. The antecedent question is whether he was in custody. I would not agree with that. I mean, it doesn't automatically mean you are in custody if you were getting asked questions, pointed questions. But there is case law, for example, in the context of when you're in the airport or the bus stop, of whether it's a voluntary consensual encounter or not, the more pointed the questions at trying to ask you about criminal conduct, the more that would lead a reasonable person to believe that they are in control. Well, no, the statements from the officer that would be suggestive of custody are you're not free to leave, you're under arrest, I'm handcuffing you, other statements related to the question of whether this was a custodial situation. Questions designed to elicit a confession, that's a separate inquiry once custody is established. And so you've got to argue that his declaration established that this was a custodial situation. Well, this court has held that being told you're not under arrest isn't some talismanic incantation that says you're not in custody. Right, it's one factor, one factor. And especially in these circumstances when the officers are executing a warrant, and even though they tell you, they may say the words you're not under arrest, they then actually exert complete control over you. So telling them you're not under arrest, like, well, what does that accomplish? Because they are still directing you, go here, go there, follow me, go into this room, I'm going to shut the door so that nobody else can see what's going on here, and then spend an hour, hour and a half. And when you ask for a lawyer, have the police officer say, no, I'm not getting you a lawyer, you're not getting a lawyer, I know you're guilty, you might as well. What happened when the officer opened the door to the bedroom? After they opened the door to the bedroom, they were still conducting the search. Mr. DeWitt alleged that his dog was kind of going a bit crazy, and he wanted to take the dog out to relieve itself. But even there, Mr. DeWitt had to ask permission. Can I leave? Will you let me go? And at that point, they did. Didn't he leave the bedroom, though, before that? Excuse me? Didn't he leave the bedroom before that? Not according to the facts that are alleged in the affidavit, Your Honor. He was able to see, before the bedroom door was closed, the officers searching. He claimed that while they were in there, another officer came into the bedroom and was pushing up the ceiling tiles and looking in the dropped ceiling. But I don't, according to the allegation. Well, after conducting their search, couldn't they have arrested them? Yes. I think they probably had probable cause. But it's not clear from what's in the record if they did an on-site quick review of what was on the computer to confirm that there was. That's kind of a normal thing. They'll do a quick search. And if they had done that, clearly they would have had probable cause. Once he gives the statement, clearly they had probable cause to arrest them that day if they wanted to. Because they waited, what, nine months? Yes. They waited a long time. With the failure to, well, the other thing I'd ask is if you look at the district court's order denying the motion to suppress issue, it's on page 12 of the appendix. He doesn't grapple with all of the facts alleged in Mr. DeWitt's affidavit. He cites some of them, but not all of them. So I see I'm in my rebuttal time, so I'll reserve the rest of the time. Yeah, that's fine. Okay. Thank you, Mr. Pat. Mr. Bedroy? Good morning, Your Honors. I'm John Bodery. I'm the U.S. Attorney up in Madison. The fact record for custody is simply Mr. DeWitt's affidavit. We accept it as true, as the district court needed to. And I say that just to start out because I think it's important that his specific word choices are reviewed. I'm not going to go through each of the facts again. They're all in the briefs. But his word choices matter, and what he didn't say, I think, matters. And I will just go through some of these word choices. He said they were bearing sidearms. They were what, I'm sorry? Bearing sidearms. He doesn't say they're drawn. He doesn't say they're brandishing or using. I think we can assume that bearing sidearms means what he meant was they had them holstered. And I think as I think of the cases and I think of what this court looks at for custody, I wanted to look at real carefully just the words Mr. DeWitt chose, take those as true certainly, and then, as I said, the things he didn't allege. So he says they're bearing sidearms. He never says, as he could have, they stuck them in my face, they waved them about. When he asks for a lawyer at first, he says, Detective Parenteau calmly stated that I didn't need to worry, I wasn't under arrest. So he doesn't say he shouted at me. He doesn't say there were raised voices. And that's something that runs throughout his affidavit. There's no allegation. What did he mean or what do you think he meant when he said he wanted a lawyer? That he has a lawyer whom he wanted to call or he wanted to be given a lawyer? I would infer from that that he wanted to call a lawyer. That's someone he knew. So he knew a lawyer that he wanted to call. And in the affidavit, I think he says, I wasn't sure what this was about. And that's not a quote. But he said something to that effect.  But I think for our purposes regarding custody, the answer that he says was given, and will accept as true, was given, as he puts it, it was calmly stated. So we don't have a shouting situation. In terms of his asking to work on his computer, and also when he was told to open up the car doors, the word he used, the verb Mr. DeWitt used, was I was informed. I'm not exactly sure what he means by that. But, again, he doesn't say they shouted at me, you can't use your computer, get the heck away, or open that darn door. I infer that informed means I was told, I was asked. Again, nothing indicating it was anything other than calmly stated. He says he was escorted to his car and back to the residence. So they had a warrant for the car. They obviously could have just busted the locks open. He doesn't say he was ordered to go to the car. He doesn't say he was grabbed or handcuffed. He was escorted to his car, meaning consistent with what he says about walking around the apartment. So he was escorted to his car. He was informed to open it, which I think we could infer means asked or told. The next thing he says is I walked, his word, I walked in the apartment while being watched. Again, and going back to your questions, Judge Posner, certainly consistent with what is going to happen in a search warrant. But he's allowed to walk about. He describes what he sees, what I'm sure looks like a melee where they're searching for things here and there and looking under everything. But, again, he doesn't say he's restrained. He doesn't say he goes around his apartment with somebody grabbing him by the arm. He says I walked about while being watched. Maybe we could just cut to the chase here. The most difficult fact for you is the bedroom issue. Right. And he's taken into the bedroom by parento, the door is closed, and the questions begin. Yes. So why isn't that custody? Not custody. Again, I think there is no allegation of restraint or physical force. There's no handcuffs.  There's a bathroom, apparently, connected to the bedroom. Because he says he came in, an officer went in the bathroom and did some searching. So somebody did come and go. Again, inside the room there's no allegation of threat. The only thing that comes close to that, and it is certainly the correct verb, he said they were badgering me. So it is, and the other thing I think to be clear is he said this was approximately one to one and a half hours. It's not two, three, four, or five. His words at page eight of his memorandum, I'm not so sure he says it in his affidavit, but that's neither here nor there. In page eight of his memorandum he says I was in the room for approximately one to one and a half hours. And I think that is the most custodial feeling situation. There's no doubt about it. The door is closed, at least for part of it. Somebody does come in. Somebody does do some searching in there. And he has these conversations. But he doesn't allege, again, any physical force, any raised tone, except for the badgering. So the facts are what the facts are. When they were through, he left the room, right? Yes. When they are through with this one or one and a half hours, he leaves the room. He does take the dog out for a walk. He started to go, and Mr. Patton is exactly correct. One of the officers goes, hey, wait a minute. Detective Parenteau was running the search, it's quite apparent from this affidavit. They turned to him and he said, sure. So he takes his dog out. He's not arrested. While that isn't determinative of whether he's in custody, it certainly, I think, flows from all the other things he hasn't alleged and didn't allege about that would have, I think, led to a clearer conclusion of custody. Did they tell him that he didn't have to answer the questions, or did he ask whether he had to answer their questions? That fact is not set out in his affidavit. He doesn't say that they told me I didn't need to answer them, and he doesn't say they told me I had to answer them. It was the, you could really help us. We know you're guilty. I know a guilty person when I see them. Those are all the things that are alleged by Mr. DeWitt and that we obviously accept for the purposes of this argument, but nothing along those lines, Judge. I want to just briefly mention the argument on the failure to investigate, because I want to put this in context and then I'll sit down. There's no assertion by Mr. DeWitt in either his affidavit or in the motion, and he refers to it very briefly at page four of his motion, that he told his trial attorney, Mr. Lieberman, I didn't do it. There's no allegation by him that I told Lieberman, you know, I lied to the cops when I said all that stuff was mine. He never says, then he never alleges that he said to Mr. Lieberman, I told them, my stepson, Mr. Cortis, I told them he used the computer, but I should have told them that it was all his porn. So what Mr. Lieberman has in front of him is a search on December 15, 2011, where they find all this stuff. He has in front of him a full confession from his client, and within that all he really has is a statement by his client that says, yes, my stepson used the computer, but nothing in that statement to the police from Mr. DeWitt that Mr. Lieberman has in front of him where Mr. DeWitt says to the cops, hey, he uses it, and the guy's like a porn guy, child porn. And then he has Cortis' interview where Cortis simply says, I never downloaded child porn, I never viewed child porn. He doesn't say anything about who put it on there, who downloaded it, although the inference becomes clear. So what, based on that's in front of Mr. Lieberman, and nothing apparently, because there's nothing alleged, where Mr. DeWitt has said, hey, I didn't say that to the police, I didn't really confess or I lied to them. I don't see why there would have been any sense, well, I better follow up and find this stepson. My client has confessed, he has not disavowed it, and all he's said in his own statement is Cortis used the computer, which is true. So it would lead sort of so what, I think. Now, had he done the follow-up and had he got this letter, which is really how the argument must flow, I must admit in our view it fits into the sort of the so what. It's a little unclear what Mr. Cortis means. I think a reasonable reading would be if I said nothing, after the defendant has said I used this computer, the cops told me if I don't say anything, this stuff could be attached to me, and I wasn't going to let it be attached to me, and I said it wasn't mine, which is, again, not exculpating to Mr. DeWitt, but simply clarifying. So we think the words he chose, the words he didn't, the facts he didn't allege would lead, correctly lead to a conclusion that he wasn't in custody, and also correctly conclude that Mr. Lieberman wasn't ineffective for failing to check out the senator. Thank you very much. Okay, thank you, Mr. Vergara. Mr. Patton, you have a couple minutes. On the issue with Cortis, Mr. DeWitt did not put this in his affidavit, but in the police report of the interview, it states that Mr. DeWitt was, Perintu told Mr. DeWitt, well, look, it's either you or somebody else using it here, and Mr. DeWitt made a statement, well, then if it's between me and my stepson, I'm going to say that it's me. To Perintu's credit, he's like, look, I don't want you to say something because you think I need to know the truth. So Mr. Lieberman would have had that, at least initially, Mr. DeWitt indicated that it might have been Mr. Cortis. Briefly, on the fact that it was calm while the warrant was being executed, the fact that you're in custody or the police can exercise control over you because they're executing a warrant, I get that that in and of itself doesn't make it custodial, but that changes the baseline. It's different than the police, than what starts out as a consensual encounter, and then you have to see if it's going up from there. The baseline is the police are in control of the situation and are ordering you around and can order you around, even if they're doing it in a calm voice. And so when you have the extra about, well, now you're going to come into your bedroom and now we're going to shut the door, that would lead any reasonable person to believe, I'm not in control of this situation, I have to do what the police tell me, or I could get arrested for obstructing their search. Thank you. Okay, thank you very much, counsel.